FILED
2016 Feb-23  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | |
|---|---|
| **SUMMIT AUTO SALES, INC.,** ] | |
| ] | |
| **Plaintiff,** ] | |
| ] | |
| **v.** ] | |
| ] | **Case No.: 2:15-CV-00736-KOB** |
| **DRACO, INC., D/B/A** ] | |
| **YANKEE FORD SALES,** ] | |
| ] | |
| **Defendant.** ] | |
| ] | |

## <u>MEMORANDUM OPINION</u>

This matter comes before the court on Defendant's "Motion to Dismiss for Lack of
Personal Jurisdiction or, in the Alternative, to Transfer Venue" (doc. 3) and Plaintiff's "Motion
to Strike Defendant's Supporting Affidavit" (doc. 6). For the reasons stated in this Memorandum
Opinion, the court will DENY the Plaintiff's Motion to Strike; will DENY the Defendant's
Motion to Dismiss; and will DENY the Defendant's Motion to Transfer.

## I.      Procedural History

Plaintiff Summit Auto Sales ("Summit") filed the instant lawsuit in the Circuit Court of
Jefferson County, Alabama on March 24, 2015, alleging breach of contract, fraud, fraudulent
suppression, fraudulent deceit, violation of Maine Revised Statutes Titles 10, § 1471, *et seq.*, and
violation of Maine Revised Statutes Title 10 § 1477 ("Maine Unfair Trade Practices Act"). (Doc.
1, at 1, 12-17). Defendant Draco, Inc., d/b/a Yankee Ford Sales ("Yankee Ford") removed the
suit to this court on April 30, 2015. (Doc. 1). On May 7, 2015, Yankee Ford filed a Motion to
Dismiss based on lack of personal jurisdiction. (Doc. 3). Yankee Ford alternatively moved the

court to transfer venue. (*Id.*). Summit responded in opposition on May 29, 2015, and moved the

court to strike the affidavit of Joseph Manning, as well as the accompanying exhibits, offered by

Yankee Ford in support of its Motion to Dismiss. (Doc. 7).

## II.   Facts

Summit is an Alabama corporation with its principal place of business in Jefferson

County, Alabama. (Doc. 1, at 12). Yankee Ford is a Maine corporation with its principal place of

business in South Portland, Maine. (Doc. 4-1, ¶ 4). Yankee Ford is a car dealership, selling new

and used cars that are stored on its property in Portland, Maine. (*Id.*, ¶ 7). Yankee Ford maintains

offices only in Maine. All of Yankee Ford's executive offices and executive-level decision

making is in Maine. Yankee Ford has never had offices in Alabama, nor has it ever had an

employee whose job responsibilities were performed in Alabama. (*Id.*, ¶ 5). Yankee Ford is not

registered to do business in Alabama.[1] Yankee Ford has no employees in Alabama, no property

in Alabama, no bank account in Alabama, and no telephone listing in Alabama. (*Id.*, ¶ 6).

Yankee Ford maintains a website, www.yankeeford.com, which is viewable in Alabama

and worldwide. (Doc. 4-1, ¶ 9).[2] This website lists Yankee Ford's address and phone number in

---

[1]Yankee Ford also avers that it is not required to pay taxes in Alabama. (Doc. 4-1, ¶6). Summit contests this fact. (Doc. 7, at 2). The court does not need to resolve this dispute because this fact would not affect the court's decision. Even if Yankee Ford is not required to pay taxes in Alabama, the court retains jurisdiction over Yankee Ford because it intentionally directed its conduct at a resident of the forum State.

[2] In its Brief in Opposition to Yankee Ford's Motion to Dismiss, Summit also discusses Yankee Ford's "solicitations" via Autotrader.com and Facebook. (*See* Doc. 7, at 3). However, Summit has offered *no evidence* of these posts. Summit has not offered affidavits describing posts on these websites or exhibits with screenshots of these posts. Summit mentioned these posts in its Brief in Opposition, but argument in a brief is not the same as evidence. Accordingly, the court will not consider these alleged solicitations in its jurisdictional analysis.

South Portland, Maine. (*Id.*). It also lists the new and used vehicles that are for sale at Yankee

Ford. (*Id.*, ¶ 10). Website viewers can search the inventory; sort the search results by year, price,

or mileage; or click to read more details about a vehicle. (*Id.*, ¶ 11). The detailed listing page has

a text box that states, "For more information on this vehicle, please either call the dealership or

fill out one of the available internet request forms on the site." (Ex. C, Doc. 4-1, at 16). Viewers

can share, email, or print the detailed listing; or request more information about a particular

listing by submitting their name, email, phone number, and question. (Doc. 4-1, ¶ 12).

Viewers can also visit one of the many links on Yankee Ford's website. Viewers can get a

trade-in appraisal from www.kbb.com; calculate payments on a loan calculator; or submit an

application for loan pre-approval. (*Id.*,  ¶ 13). Interested customers may request to schedule a test

drive by submitting their name, email, phone number, and the best time to call. (*Id.*, ¶ 14; Ex. E,

Doc. 4-1, at 20). Customers can request their credit scores. (Doc. 4-1, ¶ 15; Ex. F, Doc. 4-1, at

22). Customers can also click the "Contact Us" tab of Yankee Ford's website. The "Contact Us"

page tells customers to "Submit this form and our Sales Advisor will contact you promptly." (Ex.

G, Doc. 4-1, at 24). The form asks customers to provide Yankee Ford with their name, address,

state, zip code, email address, phone number, best time and method of contact, and a message.

(Doc. 4-1, ¶ 16; Ex. G, Doc. 4-1, at 24).

Yankee Ford's website also has a chat option on it, which allows customers to chat with

someone on behalf of Yankee Ford.  The chat function appeared on the website with the words

"Live Chat" in 2013 when the vehicles in question were purchased, but later appeared on the

website as "Chat Now." (Doc. 9, at 15, ¶ 8) ("The 'Live Chat' option . . .  was substantially the

same thing as the "Chat Now" option."). The chat feature "is administered by an outside

company that does not have the authority to negotiate or sell on behalf of Yankee Ford." (*Id.*). Summit did not use the chat option in its communications with Yankee Ford. (*Id.*).

On February 3, 2010, Summit purchased five used vehicles from Yankee Ford.[3] (Doc. 4-1, ¶ 20). Summit contacted Yankee Ford, spoke with a sales representative, and purchased the vehicles by mailing checks to Yankee Ford in Maine. Summit then arranged for the vehicles to be shipped by a third party. Yankee Ford did not arrange for the shipping of the vehicles. (*Id.*).

In October 2013, Jaber Nyrabeah, the online sales buyer for Summit Auto Sales, spoke with Martin "Marty" Daring, an employee at Yankee Ford, on five different occasions regarding seven used Mercury Grand Marquises listed for sale on Yankee Ford's website. (Doc. 7-4, ¶ 6). These seven cars are the vehicles at issue in this case.

Nyrabeah says that when he spoke to Daring, Daring told him that "the highest bidder would get the cars," but that "since Summit Auto had an existing relationship with them . . . he would try to work with [Nyrabeah] to get the cars." (Doc. 7-4, ¶ 7). Summit alleges that Yankee Ford did not disclose that the vehicles had prior use as taxis at any point during the negotiation or sales process. (Doc. 1, at 13, ¶ 11). Jaber Nyrabeah avers that he personally asked Yankee Ford if the vehicles had been used as taxis, and that Marty Daring told him they had not. (Doc. 7-4, ¶ 8). Nyrabeah further asserts that Daring sent him pictures, which showed no markings of taxis, via OneDrive, a file hosting service that allows users to upload and share files. (*Id.*).

On October 23, 2013, Summit agreed to purchase the seven used Mercury Grand

---

[3] These five vehicles are not at issue in this case; however, this contact is relevant for the purposes of assessing whether Yankee Ford knew Summit was an Alabama customer and determining whether Yankee Ford purposefully sought to do business with Summit, a known Alabama customer, when it sold Summit the vehicles in question in this case.

Marquises from Yankee Ford for a total purchase price of $69,800.00. (Doc. 1, at 13, ¶ 9; Doc. 4-1, ¶ 21). Nyrabeah agreed to the purchase, on behalf of Summit, by accepting Marty Daring's offer over the phone. After accepting, Nyrabeah faxed Daring Summit's dealer license and title guarantee letters. Yankee Ford in turn faxed Summit the Bills of Sale and signed title guarantee letters. (Doc. 7-4, ¶¶ 10-11). Summit paid for the vehicles by mailing a check for the purchase amount to Yankee Ford on October 31, 2013. (Doc. 1, at 13, ¶ 9; Doc. 4-1, ¶ 21). Again, Summit arranged for the vehicles to be shipped by a third party. (Doc. 4-1, ¶ 21).

After purchasing the vehicles, Summit contracted to sell the seven vehicles to a buyer in Saudi Arabia for $100,900.00. (Doc. 1, at 13, ¶ 9). Summit arranged for the vehicles to be shipped to Saudi Arabia, but on or around December 10, 2013, Summit received a letter from the Saudi Arabian buyer stating that the vehicles had not been released from customs because they had prior use as taxis and consequently were not allowed into the country. (*Id.*, at 13, ¶ 13). Summit says that it tried to work with Yankee Ford and Saudi Arabian Customs to resolve this issue, but eventually, on January 30, 2015, Yankee Ford admitted that the vehicles had prior use as taxis. (*Id.*, at 13, ¶ 15).

Yankee Ford communicated with Alabama buyers on at least two other occasions. Mousa Hassan, owner of Bethlehem Motors car dealership in Alabama, communicated with Yankee Ford in March 2012 about purchasing three Grand Marquises. (Doc. 8). Yankee Ford sent Hassan several text and picture messages of the vehicles. (Doc. 8-1). Riad Alabsi, the wholesale vehicle buyer at Oxmoor Cars dealership in Birmingham, Alabama, communicated with Yankee Ford about purchasing Grand Marquises "sometime in late 2013." (Doc. 7-3). Alabsi communicated with Yankee Ford's Sales Manager over the phone. (*Id.*).

III.    **Motion to Strike**

A.    Joseph Manning's Affidavit

In support of its Motion to Dismiss, Yankee Ford offered the affidavit of Joseph Manning, who has been employed as Treasurer at Yankee Ford since 1988. (Doc. 4-1, ¶ 2). Manning's duties as Treasurer include "financial management, reviewing the ordering of new vehicles, and monthly financial review." (*Id.*). Manning asserts that, as Treasurer, he has "gained personal knowledge regarding Yankee Ford, including familiarity with its articles of incorporation, bylaws, registrations to do business, office and personnel locations, locations where Yankee Ford does work, and the nature of Yankee Ford's work." (*Id.*). In his supplemental affidavit, Manning further avers that "Yankee Ford is a small shop" and that he is " intimately familiar with the day-to-day business of Yankee Ford," as well as "the marketing and advertising done by Yankee Ford," and the sales and sales processes of Yankee Ford. (Doc. 9, ¶¶ 3-4,6).

Summit argues that Joseph Manning's affidavit should be stricken in its entirety because it is not based on his personal knowledge and "is replete with inaccuracies, speculation, and legal conclusions." (Doc. 7, at 8). However, should the court choose not to strike Manning's entire affidavit, Summit alternatively requests that the court strike paragraphs 8, 18, 19, 20, 21, and 23 of Manning's affidavit. (*Id.*, at 4-8).

"[W]hen an affiant avers that his statements are based on personal knowledge, a district court is 'bound to accept [such] statements as true, unless the context demonstrate[s] otherwise.'" *HomeBingo Network, Inc. v. Chayevsky*, 428 F. Supp. 2d 1232, at 1239 (S.D. Ala. 2006) (quoting *Martin v. Rumsfeld*, 137 F. App'x 324, 326 (11th Cir. 2005)). Manning has averred that his affidavit is based on his personal knowledge. Thus, the court is bound to accept Manning's

6

statements as true unless the context demonstrates otherwise.

Summit objects to Manning's affidavit in part because it contends that as Treasurer, Manning does not have "any personal knowledge of any of the sales documents, sales calls, emails, chat or other communications between Yankee Ford and Summit." (Doc. 7, at 6). Manning has averred that he has personal knowledge of the statements in his affidavit. Manning also supplemented his affidavit and explained that because Yankee Ford is a small shop, he is very involved with the day-to-day operations of the shop and has personal knowledge of its marketing and sales processes. The court has no basis to question these averments.

Summit also contends that Manning's affidavit should be stricken because it fails to mention the "Live Chat" or "Chat Now" option available on Yankee Ford's website. Paragraph 18 of Manning's affidavit states that no "negotiations" are conducted through the website, and paragraphs 8, 18, 19, 20, and 21 of Manning's affidavit state that Yankee Ford does not "solicit" via its website. (Doc. 4-1). Summit contends that these paragraphs should be stricken because they inaccurately state that Yankee Ford does not "solicit" or "negotiate" through its website.

Manning does fail to mention the chat option in his original affidavit. This omission, however, does not make his affidavit untrue—at best, perhaps, his affidavit is incomplete. Nonetheless, when Manning's affidavit is read alongside the documents attached to it as exhibits, the picture is complete. In three of the seven screenshots of Yankee Ford's website, attached as exhibits to Manning's affidavit, a text box saying "Chat Now" appears prominently in the top right corner of the page. (Doc. 4-1, at 8, 10, 16). Manning and Yankee Ford did not conceal this feature.

However, lest any confusion remain regarding the chat option, Manning clarifies in his

supplemental affidavit that the chat option "does not permit buyers to negotiate or purchase vehicles" and is just "another way to contact the dealer, like our phone number or email." (Doc. 9, ¶ 8). Manning's original affidavit, along with the exhibits to his affidavit and his supplemental affidavit, provides a complete representation of Yankee Ford's website. Therefore, Manning's failure to mention the chat option in his original affidavit does not provide a basis for striking Manning's affidavit or the specified paragraphs.

Summit's objections to Paragraphs 21 and 23 of Manning's affidavit also lack merit. In paragraph 21, Manning says that "Yankee Ford does not know if the vehicles were ever shipped to Alabama, but, based on Summit's Complaint, it appears that they may not have ever been shipped to Alabama." (Doc. 9). In paragraph 23, Manning says "I am not even sure of the extent to which Yankee Ford was aware of where Summit was located." (*Id.*). Summit contends that these paragraphs should be stricken because they are based on speculation.

The court disagrees. Manning possesses sufficient personal knowledge to state whether Yankee Ford knows if the vehicles were shipped. (Doc. 9). However, to the extent this statement contains speculation in Manning's statement that *it appears* that the vehicles may not have been shipped, the court does not need to strike this portion of Manning's affidavit because it has not relied on this statement in ruling on Yankee Ford's Motion. Both parties agree that Yankee Ford was not involved in the shipping. Therefore, whether the vehicles were ever shipped to Summit has no bearing on whether the court has jurisdiction over Yankee Ford.

Summit's objection to Manning's statement that he was "not even sure" if "Yankee Ford was aware of where Summit was located" is also unfounded. The court does not need to strike this aspect of Manning's affidavit because this statement does not establish whether Yankee Ford

knew where Summit was located. Manning simply says "I am not sure." Therefore, the court will evaluate the evidence as a whole to determine whether Yankee Ford knew where Summit was located.

Because the context of Manning's affidavit has not demonstrated that Manning's statements are untrue, the court is bound to accept his statements as true. Therefore, the court will DENY Summit's Motion to Strike Manning's affidavit.

B.      Exhibits Attached to Manning's Affidavit

Summit also moves to strike the exhibits attached to Manning's affidavit, which are screenshots of Yankee Ford's website. Summit moves to strike these exhibits on the ground that they are inadmissible hearsay.

Yankee Ford purported to offer these exhibits under the business records exception to hearsay—Fed. R. Evid. 803(6). (*See* Doc. 4-1, ¶ 3 (tracking the language of the business records exception and stating that the documents "were kept in the ordinary course of Yankee Ford's business in accordance with Yankee Ford's practice of making such records and which were made at or near the time of the transactions by, or from information transmitted by, a person with personal knowledge of the facts as set forth in those documents.")). Thereafter, Summit moved to strike the exhibits because the exhibits were made by someone other than Manning, and were, therefore, inadmissible hearsay. (Doc. 7, at 5). Summit asserted that these exhibits did not fit within the business records exception to hearsay because they were not made "at or near the time of the transactions." (*Id.*). Summit, in turn, replied with reasons why Summit's arguments were inapposite and why the screenshots fit within the business records exception to hearsay. (Doc. 9, 3-5).

Both parties have missed the mark on this point. The exhibits are admissible for a much simpler reason: they are <u>not hearsay</u>.

Federal Rule of Evidence 801(c) provides that hearsay is "a *statement* that . . . a party offers in evidence *to prove the truth of the matter asserted* in the statement." (emphasis added). A "statement" is further defined as "a person's oral assertion, written assertion, or nonverbal conduct, if the person intended it as an assertion." Fed. R. Evid. 801(a).

First, the screenshots are not hearsay because they are not statements. Courts within the Eleventh Circuit have recognized that photographs are not statements unless they are intended as assertions. *See, e.g., United States v. Steiger*, No. 2:04CV455-WHA, 2006 WL 3450140, at *15 (M.D. Ala. 2006) (explaining that photographs were not hearsay because they were not assertions). Likewise, website screenshots are not assertions when they are offered to show what content is found on the website. *See Perfect 10, Inc. v. Cybernet Ventures, Inc.*, 213 F. Supp. 2d 1146, 1155 (C.D. Cal. 2002) ("To the extent these images and text are being introduced to show the images and text found on the websites, they are not statements at all—and thus fall outside the ambit of the hearsay rule."). The screenshots in this case were offered as representations of what Yankee Ford's website looked like, so they are not statements as defined by the Federal Rules of Evidence.

Second, the screenshots of Yankee Ford's website are not hearsay because they were not offered for the truth of the matter asserted. When screenshots are only offered to show "what is on the websites," they are not hearsay. *United States v. Standring*, No. 1:04CV730, 2005 WL 3981672, at *2 (S.D. Ohio Oct. 19, 2005) ("The Court finds such documents are not hearsay to the extent such documents are introduced to show what is on the websites."); *see also Premier*

*Nutrition, Inc. v. Organic Food Bar, Inc.*, No. SACV 06-0827 AG, 2008 WL 1913163, at *7 (explaining that printouts of a website were "not offered to show whether the companies actually sell the bars advertised, or to show the exact ingredients in the bars. Instead, they [were] offered to show the term 'organic food bar' appears on websites of this sort.").[4]

Yankee Ford offered the screenshots in question to show Yankee Ford's website looked like—not to show that any of the content on Yankee Ford's website was true. Yankee Ford did not offer the screenshots to show that it had certain cars available or that it sold cars for a particular price. Yankee Ford also did not offer the screenshots to show what representations it made regarding the cars sold to Summit. Yankee Ford offered the screenshots only to show the features that were available on its website and to demonstrate the degree to which a customer could interact with a salesperson through its website. Because the screenshots were offered only for the purposes of showing what features were available on Yankee Ford's website, the screenshots are not hearsay.

Because the screenshots are not hearsay, they only need to meet the authentication requirements of Federal Rule of Evidence 901 to be admissible. To authenticate the screenshots, "the proponent must produce evidence sufficient to support a finding that the item is what the proponent claims it is." Fed. R. Evid. 901(a). Screenshots or website printouts are properly

---

[4] *Compare United States v. Hassan*, 742 F. 3d 104, 132-33 (4th Cir. 2014) (discussing whether screenshots of Facebook posts were admissible under business records exception to hearsay when Government sought to introduce posts *to prove the truth of statements* made by Defendant).

*Hassan* is distinguishable from the present case because the screenshots in *Hassan* were offered for the truth of the statements made by the Defendant in his Facebook posts. The screenshots in the instant case were offered to show the features available on Yankee Ford's website, not the truth of any statements made by Yankee Ford.

11

authenticated when the proponent declares that the printouts are "true and correct copies of pages printed from the Internet" and "a reasonable juror could find in favor of authenticity." *Perfect 10*, 213 F. Supp. 2d at 1154.

In the instant case, Joseph Manning has averred that he has "personally examined and [has] personal knowledge of the documents as exhibits to [his] affidavit" and that each of the screenshots are true and accurate copies of the various pages of Yankee Ford's website. (Doc. 4-1, ¶¶ 3, 9-11, 13-16). The exhibits also show the web address and the copyright date of 2015. The court finds that Manning's declaration, in combination with the other circumstantial indicia of authenticity, such as the copyright date and the web address, is sufficient to support a reasonable juror belief that the exhibits are what Manning and Yankee Ford say they are. Accordingly, the screenshots are admissible.

The court recognizes that Yankee Ford's exhibits show a copyright date of 2015, while the transactions that form the basis of this case occurred in 2013; however, the difference in time affects the *weight* of the exhibits, not their *admissibility*. The 2015 exhibits still retain value and are helpful to the court in demonstrating the ways that customers can communicate with Yankee Ford through its website. Moreover, the only significant difference that Summit has noted between the 2013 and 2015 websites is the change of the chat feature from "Live Chat" to "Chat Now." The court has noted this change.

Because the screenshots are admissible, the court will DENY Summit's Motion to Strike these exhibits.

IV.    **Motion to Dismiss**

    A.    Legal Standard

A Rule 12(b)(2) motion attacks the court's jurisdiction over the defendant's person.  In determining whether personal jurisdiction exists, a federal court sitting in diversity undertakes a two-step inquiry: "the exercise of jurisdiction must (1) be appropriate under the state long-arm statute and (2) not violate the Due Process Clause of the Fourteenth Amendment to the United States Constitution."  *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009).

"The plaintiff bears the burden of establishing personal jurisdiction over the defendant [but] 'need only make a prima facie showing.'"  *S & Davis Intern., Inc. v. The Republic of Yemen*, 218 F.3d 1292, 1303 (11th Cir. 2000) (quoting *Taylor v. Phelan*, 912 F.2d 429, 431 (10th Cir. 1990)).  The court must accept the allegations in the complaint as true. *Id.* "Where, as here, the defendant challenges jurisdiction by submitting affidavit evidence in support of its position, 'the burden traditionally shifts back to the plaintiff to produce evidence supporting jurisdiction.'" *Mazer*, 556 F.3d at 1274 (quoting *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)).  If "the plaintiff's complaint and supporting evidence conflict with the defendant's affidavits, the court must construe all reasonable inferences in favor of the plaintiff." *Meier*, 288 F.3d at 1269.

Alabama's long-arm statute authorizes courts to "assert jurisdiction to the fullest extent constitutionally permissible." *Mutual Serv. Ins. Co. v. Frit Ind., Inc.*, 358 F.3d 1312, 1319 (11th Cir. 2004); *see also* Ala. R. Civ. P. 4.2. Thus, this court's sole inquiry in its personal jurisdiction analysis is whether exercising jurisdiction over the Defendant is permissible under the Due Process Clause of the Fourteenth Amendment. *Mutual Serv. Ins. Co.*, 358 F.3d at 1319. The Due

Process Clause requires that, to subject an out-of-state Defendant to suit, the Defendant must "have certain minimum contacts with [the forum State] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. State of Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Due process also "mandates a consideration of the fairness in forcing the defendant to litigate in a foreign forum." *Butler v. Beer Across America*, 83 F. Supp. 2d 1261, 1265 (N.D. Ala. 2000) (citing *Madara v. Hall*, 916 F.2d 1510, 1517 (11th Cir. 1990) and *Cable/Home Communication v. Network Productions, Inc.*, 902 F.2d 829, 857 (11th Cir. 1990)).

Personal jurisdiction may be either general or specific. General personal jurisdiction arises "[w]hen a state exercises personal jurisdiction over a defendant in a suit not arising out of or related to the defendant's contacts with the forum . . . ." *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n. 9 (1984). "The due process requirements for general personal jurisdiction are more stringent than for specific personal jurisdiction, and require a showing of continuous and systematic general business contacts between the defendant and the forum state." *Consolidated Dev. Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1292 (11th Cir. 2000). General jurisdiction is proper when a defendant has contacts with the State that are so "'continuous and systematic' as to render [the Defendant] essentially at home in the forum State." *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 131 S. Ct. 2846, 2851 (2011). "Only a limited set of affiliations with a forum will render a defendant amenable to [general] jurisdiction" in a forum State. *Daimler AG v. Bauman*, 134 S. Ct. 746, 760 (2014). The "paradig[m] . . . bases for general jurisdiction" for a corporation are its "place of incorporation and principal place of business." *Id.* (citations omitted).

14

Specific personal jurisdiction arises "when a State exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum . . . ." *Helicopteros*, 466 U.S. at 414 n. 8. To be subject to specific personal jurisdiction, a corporation must "purposefully avail[] itself of the privilege of conducting activities within the forum State." *Hanson v. Denckla*, 357 U.S. 235, 253 (1958). Additionally, that the defendant could be sued in the forum State should not be merely foreseeable, but rather the defendant's contacts with the forum State must be "such that he should *reasonably anticipate* being haled into court there." *World-Wide Volkswagen Corp. v. Woodsen*, 444 U.S. 286, 297 (1980) (emphasis added). A defendant should "anticipate being haled into court" in a forum state if it intentionally aims its allegedly tortious conduct at that forum State. *Calder v. Jones*, 465 U.S. 783, 789-90 (1984); *see also Keeton v. Hustler Magazine*, 465 U.S. 770, 781 (1984) (explaining that a defendant in a libel action who "exploited [a forum State's] market" could "reasonably anticipate being haled into court there"). If the defendant's conduct "creates a 'substantial connection' with the forum, even a single act can support jurisdiction." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 n. 18 (1985) (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)).

      B.    <u>Discussion</u>

          1.    General Jurisdiction

Yankee Ford's contacts with the State of Alabama are not significant enough to allow the court to exercise general personal jurisdiction over it. Yankee Ford's contacts with the State are not so "continuous and systematic" as to render it at home in Alabama. Yankee Ford is not incorporated in Alabama. It does not have its principal place of business in Alabama. It does not do any significant amount of business in the State.

15

Yankee Ford does have a few limited contacts with Alabama. It maintains a website that is viewable in Alabama; it sold vehicles to Summit in 2010 and in 2013 (*see* doc. 4-1, ¶¶ 20-21); and it has attempted to sell vehicles to at least two other Alabama car dealers (*see* docs. 7-2 & 7-3). However, even construing all reasonable inferences from the evidence in Summit's favor, Yankee Ford has had, at best, isolated and occasional instances of contact with the State of Alabama. Yankee Ford's contacts are far from being continuous and systematic enough to render it at home in the State. Therefore, Yankee Ford is not subject to general jurisdiction in Alabama.

2.     Specific Jurisdiction

Yankee Ford's contacts are, however, significant enough to allow the court to exercise specific personal jurisdiction over it in the context of this case.

The court exercises specific personal jurisdiction based on a defendant's contacts with the forum State that "relate[] to the cause of action alleged in the complaint." *See Consolidated Development Corp. v. Sherritt, Inc.*, 216 F.3d 1286, 1291(11th Cir. 2000) ("Specific jurisdiction arises out a party's activities in the forum that are related to the cause of action alleged in the complaint.").

Yankee Ford's principal *related* contacts with the State of Alabama are the maintenance of a website that was viewed by Summit and the subsequent negotiations and sale of seven vehicles to Summit in 2013. The allegations in Summit's Complaint and the affidavits offered by Summit and Yankee Ford establish that Summit visited Yankee Ford's website, contacted Yankee Ford to express interest in the vehicles available on its website, spoke on the phone to a Yankee Ford salesperson five times, received photos from Yankee Ford through an online file sharing service, and purchased seven vehicles from Yankee Ford by accepting a salesperson's

16

offer over the phone. Summit and Yankee Ford then faxed each other the documentation required to complete the sale, and Summit mailed a check for the purchase price to Yankee Ford in Portland, Maine. Summit then arranged for the vehicles to be shipped by a third party company.

If a defendant's conduct "is intentional and is directed at a victim in another state, the defendant may be held to have expected its conduct to have an effect in that state, and further to have expected that the victim will bring suit for redress there." *Coblentz GMC/Freightliner, Inc. v. General Motors Corp.*, 724 F. Supp. 1364, 1369 (M.D. Ala. 1989) (discussing *Calder,* 465 U.S. 783). When defendants know that their conduct will "have a potentially devastating effect" on a resident of the forum State, then they should "reasonably anticipate being haled into court there." *Calder,* 465 U.S. at 789-90.

Merely negligent conduct will not satisfy the *Calder* "effects test"; only conduct that is intentional will create the requisite minimum contacts. The United States Supreme Court in *Calder* explained the important distinction between torts that are *intentional and targeted*, and those that are *negligent and untargeted*. In finding jurisdiction over Florida defendants who directed their allegedly tortious actions at the forum State of California, the Supreme Court wrote:

> . . . . Petitioners liken themselves to a welder employed in Florida who works on a boiler which subsequently explodes in California. Cases which hold that jurisdiction will be proper over the manufacturer . . . should not be applied to the welder who has no control over and derives no direct benefit from his employer's sales in that distant State.
>
> Petitioners' analogy does not wash. Whatever the status of their hypothetical welder, petitioners are not charged with mere untargeted negligence. Rather, *their intentional, and allegedly tortious, actions were expressly aimed* at [the forum State].

17

465 U.S. at 789 (emphasis added).

Numerous other courts have likewise found that an out-of-state defendant's limited, but *intentional* and *allegedly tortious* conduct was sufficient to support the exercise of personal jurisdiction. *See, e.g., Licciardello v. Lovelady*, 544 F.3d 1280, 1285, 1288 (11th Cir. 2008) (noting that "even a single act can support jurisdiction" and upholding personal jurisdiction based on "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum."); *Wien Air Alaska, Inc. v. Brandt*, 195 F.3d 208, 213 (5th Cir. 1999) (finding jurisdiction and stating that "[w]hen the actual content of communications with a  forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment."); *Brown v. Flowers Indus., Inc.,* 688 F.2d 328, 333-34 (5th Cir. 1982) (reversing district court's dismissal for lack of personal jurisdiction where out-of-state defendant allegedly initiated defamatory telephone call to resident in forum State); *Coblentz*, 724 F. Supp. at 1368 (finding jurisdiction over intentional inference with business relations claim based on conduct that was "intentional and . . . directed at a victim in another state)*; Prof'l Locate & Recovery, Inc.*, No. 07-0175-WS-C, 2007 WL 2333218, at *8 (S.D. Ala. Aug. 15, 2007) (exercising jurisdiction over an out-of-state law firm that was "alleged to have intentionally directed false and misleading communications to an Alabama resident, causing injury in Alabama.").

Yankee Ford's alleged conduct was intentional. Summit alleges that Yankee Ford intentionally misrepresented the prior use of the vehicles in question by posting deceptive listings for the vehicles on its website and by directly misrepresenting the prior use of the vehicles to

Summit in its communications via telephone and OneDrive. As the Eleventh Circuit has noted, "Intentional torts . . . may support the exercise of personal jurisdiction over the nonresident defendant who has no other contacts with the forum." *Licciardello,* 544 F.3d at 1285 (citing *Calder*, 465 U.S. at 790). Yankee Ford's intentional conduct allows the court to exercise jurisdiction over it. Summit does not allege that Yankee Ford was merely negligent in failing to tell Summit that the vehicles at issue had prior use as taxis. Rather, Summit alleges that Yankee Ford *deliberately* and *intentionally* misrepresented the prior use of the vehicles.

In his affidavit, Jaber Nyrabeah, the online sales buyer at Summit, asserts that he personally asked Yankee Ford if the vehicles in question had been used as taxis, and that a salesperson at Yankee Ford told him they had not. (Doc. 7-4, ¶ 8). Yankee Ford has offered no evidence to contradict this statement. Therefore, for purposes of this Motion, the court assumes that Yankee Ford made the express representation that the vehicles had not been used as taxis. Because this representation, as well as the sending of misleading pictures to Summit via OneDrive, was "intentional" and was "directed at a victim in [Alabama]," Yankee Ford "may be held to have expected its conduct to have an effect [here]." *Coblentz,* 724 F. Supp. at 1369.

Furthermore, Yankee Ford "is not being haled into court in Alabama because of random or fortuitous contacts." *Prof'l Locate & Recovery*, 2007 WL 2333218, at *8. The court does not find that Yankee Ford is subject to jurisdiction in Alabama merely because it maintained a website that happened to be viewed by an Alabama buyer. Rather, the court finds that Yankee Ford is subject to jurisdiction in Alabama because it directed its allegedly tortious misrepresentations at a specific Alabama buyer, after that buyer had viewed Yankee Ford's website and had contacted Yankee Ford to express interest in the vehicles it had listed for sale.

19

Yankee Ford's alleged "false and misleading communications" that the vehicles in question did not have prior use as taxis were directed at Summit in Alabama, were intentional, and were allegedly tortious. These contacts, therefore, provide a basis for the court to exercise jurisdiction over Yankee Ford.

Yankee Ford argues that, *Calder* and its progeny aside, the court should look to the cases of *Butler v. Beer Across America*, 83 F. Supp. 2d 1261 (N.D. Ala. 2000), and *Ex parte Harrison*, 7 So. 3d 1020 (Ala. Ct. Civ. App. 2008) because it suggests those cases are more analogous to the present case and are more recent than *Calder*. The court is not persuaded that these cases are more analogous to the instant case.

In *Butler*, an Alabama minor purchased beer over the internet from an Illinois company. The Illinois defendant's website and sale of beer to an Alabama resident were the defendant's only contacts with the State. The court analyzed the level of interaction afforded by the website and concluded that "the limited degree of interactivity available on the defendants' website is certainly insufficient to satisfy the minimum contacts requirement of due process . . . ." *Butler,* 83 F. Supp. 2d at 1268.

In *Harrison,* an Illinois defendant sold a car to an Alabama plaintiff through the Ebay Motors website. Upon discovering that the vehicle that he purchased was not a police car as represented in the Ebay listing, but was actually a taxi, the Alabama buyer sued the Illinois defendant for fraud and violation of the Alabama Deceptive Trade Practices Act. The court found that it did not have jurisdiction over the Illinois seller because the website "was not directed at Alabama specifically and the advertisement was passive in nature." *Harrison*, 7 So. 3d at 1028.

Although *Butler* and *Harrison* share factual similarities with the instant case, their

holdings are distinguishable. In each of the cases, the Defendant's relatively "passive" website was its only means of communication with the Alabama buyer prior to the sale. The *Butler* court explained that the Alabama minor "was never directly solicited by defendants by any means prior to placing his order." 83 F. Supp. 2d at 1267. Similarly, the *Harrison* court explained that "the sale of the Crown Victoria to [the plaintiff] was a single, isolated contact with a resident of Alabama that was initiated by the Alabama resident rather than the defendants." 7 So. 3d at 1029.

In contrast, Yankee Ford's website was not its only means of communicating with Summit prior to the sale in question, and Yankee Ford's contacts with Summit cannot be characterized as a "single, isolated contact." Although the transaction at issue began similar to the sales in *Butler* and *Harrison*, with an Alabama buyer visiting an out-of-state defendant's website, that visit is not the end of the story here. After visiting Yankee Ford's website, Summit communicated over the phone with Yankee Ford several times. In these phone calls, Summit contends that Yankee Ford told Summit that the vehicles had not been used as taxis. Summit also asserts that Yankee Ford sent pictures of the vehicles through OneDrive to encourage Summit to buy them. The phone calls, the pictures sent through OneDrive, and the representations made during these communications were inducements to buy directed at the Alabama resident that were not present in either *Butler* or *Harrison.*

Moreover, in *Harrison*, the plaintiff's claim stemmed *only* from a misrepresentation made via an online listing that was not directed at any particular buyer. Here, Summit's claims stem *in part* from misrepresentations made via Yankee Ford's online listings, which were not directed at any particular buyer, but also and *more importantly* from Yankee Ford's subsequent affirmative misrepresentations, which were directed exclusively at Summit in Alabama.

21

In this case, after Yankee Ford received Summit's initial expression of interest, Yankee Ford *chose* to communicate and engage in further negotiations with Summit, an Alabama buyer. This purposeful series of communication between Yankee Ford and Summit provides the basis for the court to exercise jurisdiction over Yankee Ford. Summit has alleged that during the phone calls between Summit and Yankee Ford, a salesperson at Yankee Ford expressly told Summit's online sales buyer that the vehicles had not been used as taxis. This intentional and allegedly fraudulent statement was directed specifically at Summit in Alabama–not the world at large.

Not only does Summit alleged that Yankee Ford made affirmative misrepresentations to it over the phone, but Summit also alleges that Yankee Ford misrepresented the vehicles' prior use by sending Summit misleading photos via OneDrive. Yankee Ford has not disputed or offered any evidence to rebut Nyrabeah's assertion that Yankee Ford sent photos via OneDrive. Therefore, the court is bound to accept this assertion as true. Yankee Ford initiated this contact and sent these pictures to Summit, and to Summit alone. This contact is one of the instances in which Summit alleges that "Yankee Ford failed to disclose that the prior use of the vehicles were as taxis." (Doc. 1, at 12, ¶ 8). "When the actual content of communications with a forum gives rise to intentional tort causes of action, this alone constitutes purposeful availment." *Wien Air Alaska*, 195 F.3d at 213. Yankee Ford's communications with Summit in the present case give rise to intentional tort causes of action, and are, therefore, sufficiently purposeful.

Marty Daring's statement that "he would try to work with [Summit] to get the cars" (doc. 7-4, ¶ 7) provides further evidence of the purposeful formation of a connection between Yankee Ford and the Alabama dealership. This statement suggests that, based on past dealings with Summit, Yankee Ford purposefully sought to do future business with Summit.

22

Furthermore, although Joseph Manning stated that he was "not even sure of the extent to which Yankee Ford was aware of where Summit was located" (doc. 4-1, ¶ 23), the court finds that Yankee Ford was aware, or at least should have been aware, of where Summit was located. Yankee Ford's prior dealings with Summit and the communications surrounding the transaction at issue were enough to inform Yankee Ford of Summit's location. Yankee Ford communicated with Summit through a phone number with an Alabama area code. Yankee Ford faxed documents to Summit's Alabama fax number. Yankee Ford accepted a check from Summit, which likely had Summit's Alabama return address on the envelope and Summit's address listed on the check. The court cannot unreasonably conclude that, despite communicating with someone from Summit several times and in various different ways – online, over the phone, by fax, and by mail – in relation to sales in both 2010 and 2013, Yankee Ford did not realize it was talking to an Alabama buyer. The more reasonable conclusion is that Yankee Ford knew that it was selling its vehicles to an Alabama buyer, and purposefully directed its communications and alleged misrepresentations at that Alabama buyer.

The court, therefore, finds that Yankee Ford's conduct and communications with Summit were sufficiently purposeful to satisfy the due process requirements of the Fourteenth Amendment. The court also finds that Yankee Ford should have reasonably anticipated being haled into court in Alabama as a result of its intentional, and allegedly tortious representations and communications.

The court further finds that exercising jurisdiction over Yankee Ford would not "offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316 (citations omitted). In evaluating the fairness of forcing a defendant to litigate in a particular forum, the

23

court should consider "the burden on the defendant, the interests of the forum State, . . . the plaintiff's interest in obtaining relief, . . .'the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies.'" *Asahi Metal Indus. Co., Ltd. v. Sup. Ct. of Cal.*, 480 U.S. 102, 113 (1987) (quoting *World-Wide Volkswagen,* 444 U.S. at 292).

The State of Alabama has a strong interest in holding out-of-state tortfeasors accountable for the harms intentionally caused to its residents. *See, e.g., Licciardello*, 544 F.3d at 1286 (citing *Calder*, 465 U.S. at 776-77) ("[S]tates have a special interest in exercising jurisdiction over those who commit intentional torts causing injury to their residents."). This interest outweighs any burden that the defendant may experience in defending itself in Alabama. As made clear in *Calder*, a resident of Alabama, injured by the intentional conduct of an out-of-state defendant, need not travel to the defendant's residence to obtain a remedy. 465 U.S. at 1487 ("An individual injured in California need not go to Florida to seek redress from persons who, though remaining in Florida, knowingly cause the injury in California.").

Because the court finds that it may constitutionally and fairly exercise jurisdiction over Yankee Ford, the court will DENY Yankee Ford's Motion to Dismiss.

## V.   **Motion to Transfer**

Yankee Ford alternatively argues that the court should transfer this case to the U.S. District Court for the District of Maine, pursuant to 28 U.S.C. § 1404(a).[5] A case may be transferred under 28 U.S.C. § 1404(a) if the defendant establishes "that the case can be better

---

[5] Yankee Ford also argues that the court should transfer this case, pursuant to 28 U.S.C. § 1406(a) because the court does not have personal jurisdiction over Yankee Ford. Because the court finds that it does have jurisdiction, a transfer under 28 U.S.C. § 1406(a) is inappropriate.

litigated and tried in another division or district." *Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1300

(11th Cir. 2001). In considering whether to transfer under § 1404(a), the court should weigh the

following factors:

> (1) the convenience of the witnesses; (2) the location of relevant
> documents and the relative ease of access to sources of proof; (3)
> the convenience of the parties; (4) the locus of operative facts; (5)
> the availability of process to compel the attendance of unwilling
> witnesses; (6) the relative means of the parties; (7) a forum's
> familiarity with the governing law; (8) the weight accorded a
> plaintiff's choice of forum; and (9) trial efficiency and the interests
> of justice, based on the totality of the circumstances.

*Manuel v. Convergys Corp.*, 430 F.3d 1132, 1135 n. 1 (11th Cir. 2005).

In considering these factors, the court finds that this action should not be transferred.

Factors 1-5 weigh equally for and against transfer of this action. The witnesses, documents, and

parties in this case are split equally between Alabama and Maine. The relevant evidence can be

produced in either forum. The inconvenience experienced by parties and witnesses will also be

relatively equal. Maine witnesses and parties who will have to travel to Alabama for proceedings

will not be inconvenienced any more than Alabama witnesses who would have to travel to Maine

for proceedings, if the action were transferred, and the court can accommodate via video

conference as needed.

Factor 6 also weighs equally between the forums. Neither party has presented any

compelling evidence as to why they would not have the means to litigate their claims in either

Maine or Alabama.

Factors 7 and 9 also weigh equally in favor of maintaining this action and transferring this

action. Summit pleads causes of action under both Maine and Alabama state law. Neither forum

will be more familiar with the relevant state law. The courts in the Northern District of Alabama and in the District of Maine are both equally capable of applying Maine and Alabama law efficiently and justly.

The only factor that weighs strongly in favor of one party is factor 8: the weight afforded to a plaintiff's choice of forum. Summit chose to file suit in Alabama. Therefore, this factor weighs in favor of the action being maintained in Alabama.

Because all of the factors except for the plaintiff's choice of forum weigh equally in favor of and against transfer of this action, the court will DENY Yankee Ford's Motion to Transfer.

**VI.    Conclusion**

Because Yankee Ford intentionally directed its allegedly fraudulent representations at Summit, a resident of Alabama, the court finds that it may constitutionally exercise jurisdiction over Yankee Ford. Accordingly, the court will DENY Yankee Ford's Motion to Dismiss. The court will also DENY Yankee Ford's Motion to Transfer and DENY Summit's Motion to Strike.

The court will enter a separate final Order along with this opinion.

DONE and ORDERED this 23rd day of February, 2016.

KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE