**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| **SUMMIT AUTO SALES, INC.,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:15-cv-00736-KOB** |
| | ] | |
| **DRACO, INC., d/b/a YANKEE FORD SALES,** | ] | |
| | ] | |
| **Defendant.** | ] | |

## MEMORANDUM OPINION

The allegations in this matter arise out of the sale of seven used cars from one used car dealer to another. Plaintiff Summit Auto Sales, the purchaser, claims that Defendant Yankee Ford Sales, the seller, failed to inform Summit prior to the sale that the seven cars had been driven as taxis, making them less valuable and unmarketable in the country in which Summit intended to resell them.

Summit brings claims of breach of contract, fraud, suppression, fraudulent deceit, and violations of Maine's Used Car Information Act ("UCIA") and Maine's Unfair Trade Practices Act ("UTPA"). Summit moves for summary judgment only as to Count V of its Complaint, which alleges that Yankee Ford violated the Maine UCIA. (Doc. 37). Yankee Ford moves for summary judgment on all of Plaintiff's claims. (Doc. 39). The court finds that Summit's Motion is due to be **GRANTED** and that Yankee Ford's Motion is due to be **GRANTED IN PART** and **DENIED IN PART**.

1

# I.    STANDARD OF REVIEW

Summary judgment allows a trial court to decide cases when no genuine issues of material fact are present and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(a). When a district court reviews a motion for summary judgment it must determine two things: (1) whether any genuine issues of material fact exist; and if not, (2) whether the moving party is entitled to judgment as a matter of law. *Id.*

In reviewing the evidence submitted, the court must view all evidence and factual inferences drawn from it in the light most favorable to the non-moving party. *See Augusta Iron & Steel Works, Inc. v. Emp'rs Ins. of Wausau*, 835 F.2d 855, 856 (11th Cir. 1988) (citation omitted). However, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999) (citation omitted).

The filing of cross motions for summary judgment does not affect the applicable Rule 56 standard. *See, e.g., United States v. Oakley*, 744 F.2d 1553, at 1555–56 (11th Cir. 1984) (quoting *Bricklayers Int'l Union, Local 15 v. Stuart Plastering Co.*, 512 F.2d 1017, 1023 (5th Cir. 1975)).[1] When parties file cross motions for summary judgment, "each side must still establish the lack of genuine issues of material fact and that it is entitled to judgment as a matter of law." *Busby v. JRHBW Realty, Inc.*, 642 F. Supp. 2d 1283, 1288 (N.D. Ala. 2009) (citations omitted). "The fact that both parties simultaneously are arguing that there is no genuine issue of fact . . . does not establish that a trial is unnecessary thereby empowering the court to enter judgment as it sees fit."

---

[1]   In *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

*Id.* at 1289 (quoting 10A ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720, at 327–28 (3d ed. 1998)).

## II.    STATEMENT OF FACTS

This case focuses on the purchase by Plaintiff Summit Auto Sales, Inc., an Alabama used car wholesaler, of seven used Mercury Marquis vehicles from Defendant Yankee Ford Sales, a Portland, Maine Ford dealership in October 2013.

Raed Badier, who has worked in the used car wholesaling industry since at least 1991, owns Summit. Summit buys used vehicles and resells them, primarily to four clients in Saudi Arabia, Jordan, and the United Arab Emirates. His experience within the industry involves exporting used vehicles to the Middle East. Summit purchases approximately 150 vehicles during a "good month," with its purchases totaling around 1,800 vehicles a year. (Doc. 37-1 at deposition 94:10–11).

At all relevant times, Summit enlisted the services of five to twelve independent contractors who purchased vehicles for it. The contractors negotiated deals over the phone and received authority from Mr. Badier to make the final call regarding a vehicle's price. Jay Nyrabeah, one of Summit's contractors, negotiated the 2013 transaction with Yankee Ford that is the subject of this lawsuit. Mr. Nyrabeah testified that Summit instructed him to purchase specific makes, models, and years of vehicles and that Summit did not provide any written protocol for determining the prior use of vehicles he purchased. Those specific makes, models, and years of cars were tailored to include vehicles in high demand in Saudi Arabia, Jordan, and the United Arab Emirates, including Mercury Marquises and vehicles manufactured in 2008 or later.

### A.     2010 Summit—Yankee Ford Transaction

In 2010, Mr. Nyrabeah negotiated Summit's purchase of five vehicles—four Mercury Marquises and one Ford Crown Victoria—from Yankee Ford for a total cost of $46,500.00. Mr. Nyrabeah located those five vehicles online at either cars.com or autotrader.com. He then called Yankee Ford and offered to purchase them. Negotiations took place verbally and the first documents Mr. Nyrabeah received from Yankee Ford were the bill of sale and the title letter, which guaranteed that Yankee Ford would provide the cars' titles within ten days of the conclusion of the transaction.

Mr. Nyrabeah could not recall whether he discussed the five vehicles' prior use or whether those vehicles were former taxis with Yankee Ford during negotiations, but stated that "[t]hey looked fine to me. I didn't think they were taxis." (Doc. 37-45 at deposition 114:8–9). The transaction concluded smoothly and caused Summit to trust Yankee Ford. Summit successfully resold and delivered those five cars to its client in Saudi Arabia, the same client to whom it would later attempt to sell the seven Mercury Marquises at issue in this suit.

### B.     2013 Summit—Yankee Ford Transaction

Around October 2013, Mr. Nyrabeah contacted Yankee Ford about purchasing one or more Mercury Marquises. He spoke to Marty Darling, with whom he had dealt during the previous transaction with Yankee Ford. On or about October 23, 2013, the parties reached an agreement for Summit to purchase seven Marquises from Yankee Ford for $69,800.00 total. As with the previous transaction, the parties negotiated the sale via telephone and a written agreement, in the form of a bill of sale, followed.

Mr. Nyrabeah noted the sale was rushed: "[t]he reason these specific cars was done in a

rush is because once I called on them and spoke to Marty, he told me there are multiple . . . dealerships trying to buy these cars, so there was massive rush to get this deal done." (Doc. 37-45 at deposition 60:10–16). He stated that Mr. Darling told him, "I'm having a lot of people interested, I'm going to take the highest bidder." (*Id.* at deposition 61: 12–14). Mr. Darling confirmed that he told Mr. Nyrabeah (1) that other people were looking at the cars; (2) that he had been receiving phone calls regarding the cars from other shippers; and (3) that he would sell the cars to the highest bidder.

Mr. Darling testified that he faxed Mr. Nyrabeah the vehicles' titles prior to closing the sale. Both Mr. Badier and Mr. Nyrabeah testified that, though they were unsure when Summit received the titles for this transaction, normally Summit did not receive titles until after its payments cleared. Mr. Badier explained that no dealer releases titles until after a buyer's payment clears. The titles for the vehicles reflected that their previous owner was East Bemis Corporation, d/b/a Elite Taxi. Marty Darling and Robert Esposito of Yankee Ford testified that a title's purpose is to demonstrate ownership, and Mr. Darling admitted that a vehicle's title is not used to prove prior use.

Mr. Nyrabeah testified that he specifically remembered asking Mr. Darling during negotiations whether the vehicles had any problems and how they had previously been used. Mr. Nyrabeah maintained that in response, Mr. Darling told him that the vehicles had no issues or problems. Mr. Nyrabeah further stated that he could not remember specifically inquiring whether the vehicles had been used as taxis, but believed he asked where the vehicles were from, and that Mr. Darling told him in reply that they had no problems. Mr. Nyrabeah also testified that Yankee Ford did not disclose anything to him that would have revealed the vehicles' prior use as taxis;

that it is customary in the trade to disclose prior use; and that the vehicles' prior use as taxis should have been, but was not, reflected in their pricing, as "[t]axis are worth, in my opinion, probably less than fifty percent of the normal price car." (Doc. 37-45 at deposition 160:23–161:1–2).

Mr. Darling testified that he did not believe Mr. Nyrabeah specifically asked about the vehicles' prior use as taxis but that he told Mr. Nyrabeah that the cars had been taxis, explaining that the holes in the vehicles' roof were from the taxi lights. According to Mr. Darling, Mr. Nyrabeah did ask about the vehicles' condition, and in response Mr. Darling told him they had previously been cabs. Mr. Darling also stated that Mr. Nyrabeah did not ask whether the vehicles had any problems.

Mr. Darling testified that, prior to the purchase, he sent photographs of the vehicles to Mr. Nyrabeah via his cell phone and that those photographs showed the holes in the roofs of the vehicles left from the taxi light assemblies, which Mr. Nyrabeah requested he have repaired. However, Mr. Darling also testified that, based on service records and repair orders, Yankee Ford removed some of the vehicles' taxi equipment prior to the negotiations between it and Summit. Those service records and repair orders do not conclusively demonstrate that *all* the taxi equipment-related repairs for all seven vehicles were made prior to Yankee Ford's negotiations with Summit. Mr. Darling testified that, prior to the sale's completion, he sent photographs to Summit showing that requested repair work—both taxi equipment-related repairs and separate body work—had been completed.

Mr. Nyrabeah testified that he requested detailed photos prior to the sale but that he did not receive any pictures until after the sale was finalized. Two weeks after the sale, Yankee Ford

provided pictures of the vehicles to Summit via email. The pictures do not indicate the vehicles' prior use as taxis.

Mr. Nyrabeah ran CARFAX reports on at least six of the seven vehicles, pulling three on October 21, 2013, before the sale was finalized, and three on October 24, 2013, after the sale was finalized. CARFAX reports usually include vehicles' prior use. Mr. Nyrabeah testified that he relies upon CARFAX reports to confirm dealers' statements about vehicles and, in this case, "to check if there was any problems with the cars, if there was anything that he didn't tell me." (Doc. 37-45 at deposition 130:14–16). All of the cars for which Mr. Nyrabeah pulled CARFAX reports on October 21, 2013 had a prior use designation of "Commercial" in their reports. On some reports, CARFAX specifically designates a prior use of "Taxi." None of the six CARFAX reports included prior use designation as a taxi.

Summit paid Yankee Ford for the vehicles via seven separate checks dated October 29, 2013. Yankee Ford sent Summit the vehicles' titles via mail after the sale was completed. Summit resold the seven vehicles to its client in Saudi Arabia for a total of $109,000.00 on October 30, 2013. Summit arranged for the vehicles to be transported from the Yankee Ford lot to a shipyard in Delaware to be exported to Saudi Arabia. The cars cleared U.S. Customs around November 14, 2013. The vehicles were held at Saudi customs and were denied entry because they were taxis. Summit's Saudi Arabian client called Mr. Badier and "cussed [him] out first," then sent a letter to Summit, dated December 10, 2013, explaining that the vehicles could not enter the country because of their designation as taxis. (Doc. 37-1 at deposition 35:9–10). Summit representatives initially believed the designation was a mistake.

Summit provided written notice of the issues with the vehicles to Yankee Ford via letter

dated December 19, 2014. Yankee Ford received the letter on December 22, 2014. The subject line of that letter reads, "Violation of Maine's Used Car Information Act" and includes the VIN numbers for the seven vehicles. The letter claims that Yankee Ford violated Maine statutory law by failing to disclose the prior use of the vehicles and requests that Yankee Ford "correct the records," with its failure to do so subjecting Yankee Ford to certain damages, including the price of the vehicles, shipping costs, and profit loss. (Doc. 41-3 at 1).

Mr. Badier testified that before Summit sent that letter, Mr. Nyrabeah called Yankee Ford "plenty" of times to discuss the vehicles' prior usage issues and that he, Mr. Badier, left messages that Yankee Ford's manager did not return. (Doc. 37-1 at deposition 91:13). Mr. Nyrabeah also testified that he called Yankee Ford multiple times to attempt to have the taxi designation corrected. Mr. Darling confirmed that he received a call from Summit "substantially after the fact" about changing the vehicles' titles, but did not recollect how many calls he had received. (Doc. 37-12 at deposition 35:15).

On June 7, 2015, Summit sold the seven Mercury Marquis vehicles to a purchaser in Bahrain at a discounted value based on their prior use as taxis; the total price received for the vehicles was $47,978.00.

C.      **Identifying and Valuing Former Taxis**

Stephen Proto, Summit's appraisal expert, testified that a commercial designation, while not conclusive as to taxi usage, could possibly indicate that the vehicle was driven as a taxi. He also testified that, as a sophisticated purchaser, he would have inspected the vehicles personally before purchasing them, given their commercial designation and 100,000-plus mileages during two years of use. He stated that typically, dealers supply to the buyer the history of vehicles they

sell; that he might not undertake further investigation if he had a level of trust with a dealer; and that he might not personally inspect vehicles if he had previously purchased from their dealer.

Mr. Proto testified that vehicles previously used as taxis are worth 43% less than similar make and model vehicles that have not been driven as taxis. He also opined that had these seven vehicles' prior taxi usage been disclosed properly, the price negotiated for them would have been "different."

Mousa Hassan, the owner of a used car dealership in Alabama, communicated with Yankee Ford in 2012, seeking to purchase three Marquises. Plaintiff offered Mr. Hassan's affidavit, in which he attested: "It is well known that vehicles with a prior use as taxis do not have a high resell value. In many countries taxis are not allowed to be imported. Because of this, I would not purchase vehicles with a prior use as taxis." (Doc. 7-2 at ¶ 6).

Riad Alabsi, the wholesale vehicle buyer at Oxmoor Cars in Birmingham, Alabama, communicated with Yankee Ford in late 2013 in his own bid to purchase the vehicles at issue in this suit. He similarly testified in his affidavit: "Grand Marquis have a greatly reduced value if they have a prior use as taxis. It is expected and well known in the industry that dealers will disclose any prior use of vehicles as taxis due to the difference in value. . . . I do not purchase vehicles with a prior use as taxis as they are not allowed in many countries." (Doc. 7-3 at ¶¶ 8, 10).[2]

---

[2] Yankee Ford argues that these affidavits should be stricken because neither affiant has personal knowledge of the transaction that is the subject of this case. However, the affiants need not have such personal knowledge, because neither is testifying about the agreement between Summit and Yankee Ford. Rather, both affiants testify as to what they personally know based on their experience in the used car sales industry. F.R.E. 701 ("If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to

### D.     Buyer's Guides

Under the Maine UCIA, all dealers must provide a disclosure statement, or "Buyer's Guide," for each used vehicle they sell, negotiate the sale of, offer for sale, or transfer.[3] *See* ME. REV. STAT. ANN. tit. 10, § 1475; 29-250 C.M.R. ch. 104, § 1(C)(2). That statement must contain, among other information, the principal use to which the motor vehicle was put by that prior owner and the dealer's duty to disclose promptly, upon the request of any person, the name and address of the previous owner of the motor vehicle. *See* § 1475(2-A); 29-250 C.M.R. ch. 104, § 1(C)(2) (setting out directions for filling out a Buyer's Guide form and making clear that the "upon the request of any person" language applies solely to the duty to disclose the previous owner's name and address).

Yankee Ford knew of the vehicles' prior use as taxis. But it did not disclose on the Buyer's Guides the prior use as taxis of the seven Mercury Marquis vehicles. Although Yankee Ford created Buyer's Guides for the seven cars, it did not give them to Summit prior to the sale.

---

determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702."); *see Yale Mortg. Corp. v. Wells Fargo Bank, N.A.*, No. 11-22605-CVI, 2012 WL 3597438, at *12 (S.D. Fla. Aug. 20, 2012) (citations omitted) ("[T]estimony as to the usage in trade of certain terms used in the [contract at issue] is not specialized knowledge within the scope of 702 and is appropriate lay opinion testimony as it was rationally based on [the witness's] own perception and helpful to determining a fact in issue . . . ."). Here, the affiants' testimony is not based on any specialized knowledge within Rule 702's scope because it is not the result of "principles and methods," but merely the affiants' own personal observation. Further, the testimony is helpful—but not conclusive—to determining whether the vehicles Yankee Ford delivered conformed to the terms of its agreement with Summit and to determining how much, if anything, Summit should receive in damages.

[3] The Maine UCIA's requirement that Maine car dealers provide a Buyer's Guide applies to this transaction because the seller, Yankee Ford, is a Maine dealer and is bound by Maine law. *See* ME. REV. STAT. ANN. tit. 10, § 1471(2) ("'Dealer' also includes . . . persons licensed to engage in the business of selling, offering for sale or negotiating the sale of used motor vehicles in states other than this State . . . .").

And those Buyer's Guides for six of the vehicles state that their prior use was "Personal," while the Buyer's Guide for the seventh vehicle states that its prior use was "Other," without listing anything on the blank line provided for explanation of that other use.

Yankee Ford representatives knew of the Maine disclosure law, but Mr. Esposito, Yankee Ford's general sales manager, understood the law to require Buyer's Guides only in retail transactions and not in wholesale purchases. Mr. Esposito testified that, while he typically does not deal with wholesalers over the telephone, where he has communicated with them via telephone, he did not provide them with used car Buyer's Guides because wholesalers understand that the vehicles are sold "as is." Mr. Esposito testified that as to wholesale vehicle sales, buyers "know what they're buying because we disclose it to them personally." (Doc. 37-22 at deposition 63:11–14). Yankee Ford employed a billing clerk, who was independent of the sales organization, to fill out the used car Buyer's Guides, but otherwise did not have procedures in place to ensure that the Buyer's Guides were accurate.

## III.   DISCUSSION

Because this case involves contractual, tort, and statutory claims, the court makes choice of law determinations on a claim-by-claim basis. A federal court sitting in diversity applies the choice-of-law rules of the forum state, which in this case is Alabama. *See Grupo Televisa, S.A. v. Telemundo Commc'ns Grp., Inc.*, 485 F.3d 1233, 1240 (11th Cir. 2007) ("As a preliminary matter, the court must characterize the legal issue and determine whether it sounds in torts, contracts, property law, etc. Once it has characterized the legal issue, it determines the choice of law rule that the forum state applies to that particular type of issue." (citations omitted)).

First, Yankee Ford asserts that Maine contract law, rather than Alabama contract law,

governs Summit's breach of contract claim. By contrast, Summit asserts that Alabama law governs. The court need not resolve the choice of law question because both Maine and Alabama have adopted the Uniform Commercial Code ("UCC"), which governs sales of goods, including cars. *See Scott v. Prudential Sec., Inc.*, 141 F.3d 1007, 1012 (11th Cir. 1998) ("We, however, need not resolve this choice of law problem because the relevant law in both states is essentially in harmony."); *Lemuel v. Admiral Ins. Co.*, 414 F. Supp. 2d 1037, 1049–50 (M.D. Ala. 2006) (stating that "[t]he first step in a choice-of-law analysis is to determine whether an actual conflict exists between the substantive laws of the interested jurisdictions"). The court, therefore, will apply the Uniform Commercial Code and will include citations to the relevant provisions of both the Alabama and Maine codes.

Second, Alabama law governs Summit's fraud claims because Alabama was the state where "the alleged economic impact was felt." *See Glass v. S. Wrecker Sales*, 990 F. Supp. 1344, 1347–48 (M.D. Ala. 1998) (applying Alabama choice-of-law rules and determining that Alabama law properly governed a fraud claim where plaintiff would have suffered any economic loss in Alabama).

Third and finally, Maine law governs Summit's claims under the Maine UCIA and UTPA. Alabama enforces rights arising under other states' laws where those rights do not conflict with Alabama public policy: "While it is well recognized that the statutes of another state have no extraterritorial force, yet rights acquired thereunder will always, in comity, be enforced, if not against the public policy of the laws of the state where redress is sought." *See San Francisco Residence Club, Inc. v. Baswell-Guthrie*, 897 F. Supp. 2d 1122, 1172 (N.D. Ala. 2012) (quoting *Caine v. St. Louis & S.F.R. Co.*, 95 So. 876, 877 (Ala. 1923)). Yankee Ford has

cited no authority indicating that the Maine UCIA or UTPA contradicts or violates Alabama public policy. Indeed, the Alabama Deceptive Trade Practices Act, ALA. CODE § 8-19-1 *et seq.*, exhibits Alabama's public policy against deceptive trade practices. *See* § 8-19-5 (providing, *inter alia*, that "[e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce" is unlawful). Yankee Ford's argument that Maine law does not govern tort claims alleging economic injuries felt in Alabama misapprehends the nature of Summit's UCIA claim, which details a violation of *statutory* rather that tort law.

### A.      Breach of Contract

Summit claims that Yankee Ford breached the parties' agreement by delivering vehicles to Summit of a lesser value than the amount paid; i.e., Summit paid for the vehicles at a price consistent with non-use as taxis but Yankee Ford delivered vehicles worth less than the purchase price because they had been used as taxis.

Summit seeks damages for Yankee Ford's breach of the parties' contract for the sale of seven Mercury Marquis vehicles under Alabama Code § 7-2-713, "Buyer's Damages for Nondelivery or Repudiation." Yankee Ford argues that Summit's breach of contract claim fails because Summit did not affirmatively reject the vehicles or revoke its acceptance of them, nor did it seasonably notify Yankee Ford of a rejection or revocation.

Under both Alabama and Maine law, a buyer may reject goods that do not conform to the terms of a contract. ALA. CODE § 7-2-601(a); ME. REV. STAT. ANN. tit. 11, § 2-601(1). A buyer accepts goods when it takes any action inconsistent with the seller's ownership of the goods. ALA. CODE § 7-2-606(1)(c); ME. REV. STAT. ANN. tit. 11, § 2-606(1)(c). A buyer may revoke its acceptance of goods if their nonconformity substantially impairs their value to the buyer, if the

buyer (a) reasonably assumed that the seller would cure the nonconformity but the seller has not seasonally done so; or (b) did not discover the nonconformity prior to acceptance, if the acceptance was reasonably induced by the difficulty of discovery prior to acceptance or by the seller's assurances. ALA. CODE § 7-2-608(1); ME. REV. STAT. ANN. tit. 11, § 2-608(1).

A buyer must reject goods within a reasonable period of time after their delivery or tender. ALA. CODE § 7-2-602(1); ME. REV. STAT. ANN. tit. 11, § 2-602(1). Similarly, a buyer must revoke acceptance within a reasonable period of time after it discovers or should have discovered the grounds for revocation. ALA. CODE § 7-2-608(2); ME. REV. STAT. ANN. tit. 11, § 2-608(2). For either rejection or revocation to be effective, the buyer must notify the seller of its rejection or revocation. ALA. CODE § 7-2-602(1) (providing that notification of rejection must be seasonable); ME. REV. STAT. ANN. tit. 11, § 2-602(1) (same); ALA. CODE § 7-2-608(2) (providing that revocation is ineffective until buyer notifies seller); ME. REV. STAT. ANN. tit. 11, § 2-608(2) (same).

A buyer who has justifiably revoked acceptance of goods has the right to resell nonconforming goods in its possession or control for which it has paid (and in which it thus has a security interest) "in good faith and in a commercially reasonable manner." Under those circumstances, the buyer can recover the difference between the resale and contract prices, plus incidental damages and less expenses saved because of the breach. *See* ALA. CODE §§ 7-2-706(1), 7-2-711(3); ME. REV. STAT. ANN. tit. 11, §§ 2-706(1), 2-711(3).

Yankee Ford concedes that a genuine dispute of fact exists as to whether the vehicles conformed to the terms of its agreement with Summit. Indeed, the record does not conclusively demonstrate a meeting of the minds, or lack thereof, regarding the vehicles' prior use as taxis. A

reasonable jury could conclude that Summit knew or should have known that the vehicles were taxis prior to completing the sale and agreed on the contracted-for price anyway. The jury could determine that Mr. Darling told Mr. Nyrabeah about the holes in the vehicles' roofs from the taxi light assemblies and that the cars had been cabs; that Mr. Darling sent Mr. Nyrabeah pictures of the vehicles showing the holes in the roofs from the light assemblies; and that Summit asked that some of the vehicles' roofs be repaired. Or, a reasonable jury could conclude that Yankee Ford concealed the vehicles' prior use as taxis from Summit; that Summit could not have learned of their previous use from CARFAX or any other source besides Yankee Ford; and that the contract price reflected non-use as taxis. So the court cannot determine whether the seven Mercury Marquises conformed to the terms of the parties' contract.

Yankee Ford contends that, regardless of whether the vehicles conformed to the agreement, it is entitled to summary judgment because Summit did not take affirmative action to reject the cars, and that if Summit's December 2014 letter to Yankee Ford is deemed to be either a rejection of the vehicles or a revocation of its acceptance, it was unseasonable.

At the outset, the court finds that Summit accepted the seven vehicles. Summit took custody of the vehicles and resold them to its client in Saudi Arabia, which is plainly inconsistent with ownership by Yankee Ford. Therefore, Summit accepted the vehicles, even if at some point, Summit revoked its initial acceptance.[4] *See* ALA. CODE § 7-2-606(1)(c); ME. REV. STAT. ANN. tit.

---

[4] For the same reason, the court finds that Summit has identified the wrong damages provision in its breach of contract count, because Yankee Ford did not fail to deliver the vehicles or repudiate its agreement with Summit; rather, the vehicles Yankee Ford delivered allegedly did not conform to the terms of the contract. The applicable damages section is, depending on whether Summit ultimately accepted the vehicles or revoked acceptance of them, § 7-2-711, "Buyer's Remedies in General; Buyer's Security Interest in Rejected Goods," or § 7-2-714, "Buyer's Damages for Breach in Regard to Accepted Goods."

11, § 2-606(1)(c) (providing that taking action inconsistent with seller's ownership of goods constitutes acceptance).

Summit later sold the cars to an entity in Bahrain, which could also operate as an acceptance. However, because resale is an available remedy when a buyer has justifiably revoked its acceptance of goods, that resale is not necessarily inconsistent with a revocation of acceptance by Summit. If Summit properly revoked acceptance before reselling the vehicles and resold them according to the relevant Alabama and Maine UCC provisions, it is entitled to the difference between the resale and contract prices, plus incidental damages and minus expenses saved because of Yankee Ford's breach. *See* ALA. CODE §§ 7-2-706(1), 7-2-711(3) (providing for the remedy of post-revocation resale of goods in which buyer has a security interest); ME. REV. STAT. ANN. tit. 11, §§ 2-706(1), 2-711(3) (same).

A genuine issue of material fact exists as to whether Summit revoked its acceptance of the seven vehicles prior to selling them to the entity in Bahrain and, if it did, whether it did so within a reasonable period of time after discovering the grounds for revocation—namely, the vehicles' prior status as taxis. Upon receiving its client's angry phone call and December 10, 2013 letter stating that the vehicles had been stalled at customs because they were taxis, Summit initially thought the designation was a mistake. At some point it recognized that the vehicles were, in fact, taxis, but the record does not reveal precisely when; even the December 19, 2014 letter to Yankee Ford does not resolve whether Summit thought at that time that the taxi designation was a clerical error.

The parties dispute whether the December 2014 letter properly revoked acceptance of the cars or merely demanded that Yankee Ford correct errors on their titles, and the letter could

support either reading. Also, the question of whether Summit's acceptance was reasonably induced by the difficulty of discovering the vehicles' taxi status prior to Summit's acceptance of the vehicles remains open. *See* ALA. CODE § 7-2-608(1)(b); ME. REV. STAT. ANN. tit. 11, § 2-608(1)(b). Thus, the determination of whether it did revoke its acceptance, and if so, when, remains a question for the jury. However, no dispute exists as to whether Summit was *entitled* to revoke acceptance of the vehicles if they did not conform to the terms of the parties' agreement by virtue of their prior use as taxis, as the evidence demonstrates that such nonconformity would substantially impair the cars' value. *See* ALA. CODE § 7-2-608(1); ME. REV. STAT. ANN. tit. 11, § 2-608(1).

And even if Summit accepted the seven cars and regardless of whether it revoked that acceptance, Summit's breach of contract claim does not fail. *See* Official Comment to ALA. CODE § 7-2-608 (noting that the changes to that section make clear that "the buyer is no longer required to elect between revocation of acceptance and recovery or damages for breach"); Uniform Commercial Code Comment to ME. REV. STAT. ANN. tit. 11, § 2-608 (same). Whether Yankee Ford delivered nonconforming vehicles remains unsolved, so Summit's breach of contract claim cannot be resolved as a matter of law.

What Summit did with the cars after they were delivered, then, goes not to whether Summit can recover against Yankee Ford at all based on its proper rejection or revocation, but to the amount of damages it is due if Yankee Ford did, in fact, breach its agreement with Summit.

For all of these reasons, the court finds that Yankee Ford has not met its burden to show that it is entitled to judgment as a matter of law regarding Summit's breach of contract claim.

**B.     Fraud**

1.     Fraudulent Misrepresentation

Summit's Count II of its Complaint, "Fraud," states a claim of fraudulent

misrepresentation based on Yankee Ford's false representations that the Mercury Marquises

carried the value of vehicles not previously driven as taxis. Under Alabama law, fraudulent

misrepresentation, which involves an affirmative act or statement as opposed to suppression of

information, consists of "(1) a false representation (2) concerning a material existing fact

(3) relied upon by the plaintiff (4) who was damaged as a proximate result." *See Fisher v. Comer*

*Plantation, Inc.*, 772 So. 2d 455, 463 (Ala. 2000) (quoting *Baker v. Bennett*, 603 So. 2d 928, 935

(Ala.1992)); *see* ALA. CODE § 6-5-101.

A jury could reasonably find that Yankee Ford  falsely represented that the Marquises had

not previously been driven as taxis because it represented to Summit that the cars were worth

almost twice what cars that had been driven as taxis were worth. Because Summit additionally

has presented evidence that it relied upon Yankee Ford's representations about the vehicles in

deciding to purchase them at the agreed-upon price and evidence that prior taxi use negatively

affects a car's value, Yankee Ford is not entitled to judgment as a matter of law as to this claim.

Yankee Ford offers a few arguments in support of entering summary judgment on this

claim. Yankee Ford asserts that Summit's fraudulent misrepresentation claim fails because "to

assert a fraud claim that stems from the same core facts as one's breach-of-contract claim, the

fraud claim must be based on representations independent of the promises contained in the

contract and must independently satisfy the elements of fraud." *Hunt Petroleum Corp. v. State*,

901 So. 2d 1, 10–11 (Ala. 2004) (Houston, J., concurring) (citation omitted).

Summit's breach of contract claim alleges that Yankee Ford failed to deliver vehicles that conformed to the terms of the parties' agreement, while its fraud claims rest on Yankee Ford's failure to disclose, *prior to the formation of the contract*, the vehicles' prior use as taxis. Those conditions are satisfied here. *See, e.g.*, *Stone v. Koch Farms of Gadsden LLC*, No. CV 1:12–3777–RBP, 2013 WL 121477, at *2 (N.D. Ala. Jan. 8, 2013) (quoting *Hunt Petroleum*, 901 So. 2d at 10 (Houston, J., concurring)) (explaining that "a plaintiff can recover for both breach of contract and fraud when the plaintiff has been fraudulently induced (through false statements about specific facts) into making a contract"). Thus, the fraud claims are "based on representations independent of the promises contained in the contract" that allegedly fraudulently induced Summit into the contract. *See Hunt Petroleum*, 901 So. 2d at 11 (Houston, J., concurring) (citation omitted).

Second, Yankee Ford argues that a statement opining on value, such as a land appraisal, does not rise to the level of fraud. *See George v. Fed. Land Bank of Jackson*, 501 So. 3d 432, 435 (Ala. 1986). But this rule is inapposite. Here, the information allegedly misrepresented is not the vehicles' value, but their prior use as taxis that affected their value.

Third, Yankee Ford argues that Summit's reliance on any misrepresentation by Yankee Ford was unreasonable, as Summit should have independently investigated the cars' prior use. "[T]o recover for misrepresentation, the plaintiff's reliance must . . . have been reasonable under the circumstances. If the circumstances are such that a reasonably prudent person who exercised ordinary care would have discovered the true facts, the plaintiffs should not recover." *Gilmore v. M&B Realty Co., Inc.*, 895 So. 2d 200, 210 (Ala. 2004) (quoting *Torres v. State Farm Fire & Cas. Co.*, 438 So.2d 757, 759 (Ala. 1983)). "[A] plaintiff's reliance can be declared unreasonable,

as a matter of law, when the undisputed evidence indicates that the plaintiff 'made a deliberate decision to ignore written contract terms that clearly contradicted the alleged misrepresentations.'" *Sirmon v. Wyndham Vacation Resorts, Inc.*, 922 F. Supp. 2d 1261, 1279 (N.D. Ala. 2013) (quoting *Massey Automotive, Inc. v. Norris*, 895 So. 2d 215, 220 (Ala. 2004)).

The only written agreement here, the bill of sale, did not specify the vehicles' prior use as taxis. A reasonable jury could find either that Mr. Darling faxed the titles to Summit prior to the sale's closing or that Yankee Ford did not send the cars' titles to Summit until after the transaction became final. Mr. Darling and Mr. Esposito testified that a title's purpose is to demonstrate ownership, and Mr. Darling admitted that a vehicle's title is not used to prove prior use, meaning that even if Summit received the titles prior to the sale's closing, it would not have necessarily concluded that the cars had previously been driven as taxis.

And Summit did investigate the cars' prior use through CARFAX. No evidence suggests that Summit could have discovered the cars' previous status as taxis through any source other than Yankee Ford or CARFAX, given that Mr. Nyrabeah did not inspect the cars in person. Further, the record supports a finding that the industry custom is for dealers to disclose prior taxi use to potential buyers. On this record, the court cannot say that Summit did not exercise ordinary care in investigating the cars' prior use.

The court declines to enter summary judgment on Summit's fraudulent misrepresentation claim because Yankee Ford did not negate genuine issues of material fact.

2.    Fraudulent Suppression

Summit pleads in Count III of its Complaint that Yankee Ford fraudulently suppressed the vehicles' taxi usage. Under Alabama law, a plaintiff claiming fraudulent suppression must

show: "(1) that the defendant had a duty to disclose the existing material fact; (2) that the defendant suppressed this material fact; (3) that the defendant's suppression of this fact induced the plaintiff to act or to refrain from acting; and (4) that the plaintiff suffered actual damage as a proximate result." *LaFerrera v. Camping World RV Sales of Birmingham*, 171 F. Supp. 3d 1257, 1269 (N.D. Ala. 2016) (quoting *State Farm Fire & Cas. Co. v. Owen*, 729 So. 2d 834, 837 (Ala. 1998)); *see* ALA. CODE § 6-5-102.

The existence of a duty to disclose presents a question of law. *Owen*, 729 So. 2d at 839.

Maine law imposed a duty on Yankee Ford to disclose these seven vehicles' prior use to their buyer. The court has discovered no Alabama authority holding specifically that an action for fraud will lie where the duty to disclose is imposed by another state's law. But courts applying Alabama law have noted that a cause of action for fraud may rest on a duty to disclose that is imposed by federal statute. *See Langford v. Rite Aid of Alabama, Inc.*, 231 F. 3d 1308, 1313 (11th Cir. 2000) ("In exploring the question of whether a duty to disclose exists in a particular situation, federal courts must go beyond state common law, and conduct an inquiry into relevant federal sources of authority."); *Ford Motor Credit Co.*, 717 So. 2d at 786 (analyzing an Alabama statute and a federal statute and finding that "[n]either the Alabama Mini–Code nor the Federal Truth–in–Lending Act requires such a disclosure"). Additionally, as the court has already noted, Alabama enforces rights arising under other states' laws where those rights do not conflict with Alabama public policy, and the Maine UCIA does not so conflict. *See San Francisco Residence Club*, 897 F. Supp. 2d at 1172 (citation omitted). And so the court finds that the Maine UCIA imposed upon Yankee Ford a duty to speak that may give rise to a fraudulent suppression claim under Alabama law.

Alternatively, even if the existence of the duty imposed by Maine statute was not enough to create a duty, under Alabama law sufficient disputed facts, if proven, support a duty to disclose. For summary judgment purposes, where material facts that could give rise to a duty are disputed,

> the court must decide in the first instance whether the circumstances asserted, if proved, would be sufficient to give rise to a duty to disclose; if the court finds the circumstances alleged would be sufficient, the jury will then be presented with the factual question of whether those circumstances indeed existed, provided of course, at the summary judgment stage of the proceedings, the plaintiff can generate a genuine issue of material fact as to the existence of those circumstances.

*State Farm Fire & Cas. Co.*, 729 So. 2d at 840 (quoting *Jones Distrib. Co. v. White Consol. Indus., Inc.*, 943 F. Supp. 1445, 1474 (N.D. Iowa 1996)).

A duty to disclose "may arise from the confidential relations of the parties or from the particular circumstances of the case." ALA. CODE § 6-5-102. Whether special circumstances give rise to a duty depends on "(1) the relationship of the parties; (2) the relative knowledge of the parties; (3) the value of the particular fact; (4) the plaintiff's opportunity to ascertain the fact; (5) the customs of the trade; and (6) other relevant circumstances." *See Owen*, 729 So. 2d at 834 (citations omitted).

As to the first special circumstances factor, the one previous successful transaction between the dealers may have created trust in Yankee Ford on Summit's part; however, one transaction does not a duty create. *Cf. Sirmon*, 922 F. Supp. 2d at 1286 (finding that "[a]lthough the interactions between [the parties] did not rise to the level of a fiduciary relationship," the "evidence indicate[d] a long-standing and active relationship which was more consequential than

the typical buyer-seller relationship").

The court addresses together the second and fourth factors, the relative knowledge of the parties and Summit's opportunity to ascertain the vehicles' prior use. Both Summit and Yankee Ford were knowledgeable as to the used car industry generally, and Summit was undoubtedly well-versed in sales of the kinds of cars it targeted, including Mercury Grand Marquises manufactured in 2008 or later. However, only Yankee Ford possessed the knowledge of *these specific vehicles'* prior use as taxis. Regarding Summit's opportunity to discover the vehicles' prior use, the CARFAX reports for six of the vehicles did not specify that the vehicles had previously been used as taxis. And the parties dispute whether Yankee Ford sent pictures of the cars showing their prior use as taxis to Summit before the sale was finalized.

Further, Mr. Nyrabeah maintained that the sale was rushed because Mr. Darling told him he had multiple other dealers calling him about the cars and that he would take the highest bidder. Thus, a jury could find that Mr. Nyrabeah, who lives in Florida, or another representative from Summit, which is located in Alabama, effectively had no opportunity to personally inspect the cars, or time to insist on pictures of the vehicles. Even had Summit representatives traveled to Maine to inspect the vehicles, they may not have been able to identify the taxi light assembly damage to the cars if Yankee Ford had completed repairs prior to its negotiations with Summit.[5]

On this record, Summit may demonstrate that the vehicles' prior use was not the kind of fact it could determine through diligent investigation. *See Sirmon*, 922 F. Supp. at 1286 (finding that plaintiffs could not have ascertained information because "[t]his situation is not comparable

---

[5] The court notes that Saudi Arabian customs was evidently able to determine that the vehicles had been taxis; however, the record does not reveal *how* customs made that determination.

to that of a used car seller withholding information which could be detected through independent inspection. Nor was the information allegedly suppressed the type of information which could be obtained through diligent online research."). No evidence shows that Summit could have somehow ascertained the vehicles' prior taxi usage through means other than CARFAX, personal inspection, or disclosure from Yankee Ford.

"Superior knowledge of a fact, without more, does not impose upon a party a legal duty to disclose such information." *Surrett v. TIG Premier Ins. Co.*, 869 F. Supp. 919, 925 (M.D. Ala. 1994) (citing *Barnes v. Liberty Mut. Ins. Co.*, 468 So.2d 124, 126 (Ala. 1985)). However, the Alabama Supreme Court "has emphasized that where one party has superior knowledge of a fact and the other party's having the same knowledge would cause the other party to take a different course of action, then a duty to disclose arises, if the other party cannot discover the fact himself." *Indep. Life & Accident Ins. Co. v. Harrington*, 658 So. 2d 892, 896 (Ala. 1994) (citing *Interstate Truck Leasing, Inc. v. Bender*, 608 So. 2d 716 (Ala. 1992)).

Yankee Ford's superior knowledge, combined with Summit's inability to ascertain the vehicles' prior use, weighs in favor of a duty even though Summit is also a commercial entity. *See First Ala. Bank of Montgomery, N.A. v. First State Ins. Co, Inc.*, 899 F.2d 1045, 1059 (11th Cir. 1990) (applying Alabama law) (finding that "[t]he parties were not dealing at arms length because" the insurer "had better knowledge about the availability of this coverage than did its client," a bank); *Beiersdoerfer v. Hilb, Rogal & Hamilton Co.*, 953 So. 2d 1196, 1208 (Ala. 2006) (holding that "[r]egardless of [plaintiff's] sophistication in the insurance-brokering business, he had no opportunity to ascertain this suppressed information; it was known only to the upper management of [defendant], who suppressed it").

Back to the third factor, which is the value of the particular fact. The prior use information was a material fact: undisputedly, a car's status as a former taxi negatively affects its value.

Regarding the fifth factor, prevailing industry custom would have prompted Yankee Ford to disclose the vehicles' former taxi status to Summit. Mr. Proto, Summit's appraisal expert, testified that typically dealers supply to the buyer the history of vehicles they sell. Similarly, Mr. Alabsi, the wholesale vehicle buyer at Oxmoor Cars in Birmingham, Alabama, averred: "It is expected and well known in the industry that dealers will disclose any prior use of vehicles as taxis due to the difference in value." (Doc. 7-3 at ¶ 8).

Sixth and finally, the most relevant other circumstance is that Maine law imposes a duty on Yankee Ford to disclose the prior use of any vehicles it sells, and that Yankee Ford representatives knew about the Maine law at the time of the 2013 sale. As previously discussed, this law weighs heavily in favor of a duty to speak.

Simply put, a jury could find that Yankee Ford knew that the seven Marquises had been driven as taxis; that fact significantly affected the vehicles' value; and Summit had no way of ascertaining the cars' prior use independently of Yankee Ford's disclosing that information.

Under either basis for finding Yankee Ford had a duty to disclose, a genuine issue of material fact clearly exists as to whether Yankee Ford breached that duty. As the court has already noted, the parties dispute whether Yankee Ford told Summit that the seven cars had previously been driven as taxis. However, no dispute exists that Yankee Ford failed to provide Buyer's Guides, which if accurate would have disclosed the vehicles' prior use as taxis. A reasonable jury could find from such failure that Yankee Ford suppressed a material fact.

As with Summit's fraudulent misrepresentation claim, sufficient evidence supports a finding that Yankee Ford's failure to disclose the vehicles' prior use induced Summit to purchase the cars at a price incommensurate with their value.[6] Accordingly, Yankee Ford has failed to demonstrate that it is entitled to summary judgment on Summit's fraudulent suppression claim.

### 3.    Fraudulent Deceit

Finally, Summit alleges that "Yankee Ford willfully deceived Summit with the intent to induce Summit to purchase vehicles at a price higher than the value of vehicles with a prior use as taxis." (Doc. 1 at 15 ¶ 38). Under Alabama law, fraudulent deceit occurs when "[o]ne . . . willfully deceives another with intent to induce him to alter his position to his injury or risk." ALA. CODE § 6-5-104; *see* § 6-5-103 (providing for a right of action when one is fraudulently deceived).

Specifically, Summit asserts that Yankee Ford willfully suppressed the prior use information. *See* ALA. CODE § 6-5-104 (explaining that deceit may consist of "[t]he suppression of a fact by one who is bound to disclose it"). The court has already determined that a genuine dispute of material fact exists as to whether Yankee Ford suppressed material information. Given Yankee Ford's knowledge of the vehicles' prior taxi use and the fact that taxi status negatively affects a car's value, Summit has at least raised a genuine issue of material fact as to whether Yankee Ford suppressed that information willfully, with an intent to mislead Summit into buying the vehicles for more than they were worth. Yankee Ford is not entitled to summary judgment on

---

[6] To the extent Yankee Ford raises in its reply brief the argument that Summit unreasonably relied on Yankee Ford's failure to disclose the cars' prior use, the court has already considered and rejected that argument in analyzing the fraudulent misrepresentation claim. *See supra* at 18–20.

this claim.

C.    **Maine Used Car Information Act**

Summit alleges that Yankee Ford violated the Maine UCIA. Both parties move for summary judgment on this claim.

The Maine UCIA, codified at ME. REV. STAT. ANN. tit. 10, §§ 1471 *et seq.*, requires that a dealer selling a used car provide the buyer with a disclosure form that includes the vehicle's prior use. ME. REV. STAT. ANN. tit. 10, § 1475. In short,

> [e]very used motor vehicle sold by a dealer for the purpose of transportation must have affixed to it a written disclosure statement called a "Used Vehicle Buyers Guide," 10 M.R.S.A. § 1475(1). The dealer is responsible for providing the information set forth on this disclosure form, including the nature of the prior use . . . . The dealer must provide the purchaser with a copy of the disclosure signed and dated by the purchaser.

*State v. Sunshine Auto Brokers*, No. CV-88-42, 1989 Me. Super. LEXIS 144, at *4 (Me. Super. July 14, 1989).

The UCIA does not distinguish between retail and wholesale sales of used cars. In fact, the UCIA specifically includes both retail and wholesale sales of used cars. *See, e.g.*, ME. REV. STAT. ANN. tit. 10, § 1475(1) ("No dealer may sell, negotiate the sale of, offer for sale or transfer *any used motor vehicle, including any used motor vehicle transferred to another dealer*, unless the dealer affixes to the vehicle a conspicuous written statement containing the information required by subsection 2-A.") (emphasis added). Yankee Ford indisputably failed to disclose the seven Mercury Marquis vehicles' prior use as taxis on their Buyer Guides. Even if Yankee Ford had provided to Summit the Buyer's Guides it did create for the vehicles, which listed prior use as "Personal" or an unexplained "Other," the Guides were false. Whether Summit was actually

27

aware of the vehicles' previous lives as taxis is irrelevant to whether Yankee Ford complied with this requirement of Maine law.

Yankee Ford incorrectly interprets the statute as requiring disclosure of a vehicle's prior use only upon request. Both the phrasing of the statute and its interpretation by state regulations and at least one judicial decision[7] demonstrate that the "upon the request" language applies solely to the previous owner's name and address. *See, e.g.*, ME. REV. STAT. ANN. tit. 10, § 1475(2-A)(B); *Sunshine Auto Brokers*, 1989 Me. Super. LEXIS 144, at *4. Ignorance of the law provides no excuse. *E.g.*, *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 581 (2010) (quoting *Barlow v. United States*, 7 Pet. 404, 411, (1833)) ("We have long recognized the 'common maxim, familiar to all minds, that ignorance of the law will not excuse any person, either civilly or criminally.'"); *Sunshine Auto Brokers*, 1989 Me. Super. LEXIS 144, at *21 ("[I]t appears evident here that the violations resulted from either ignorance of the law or . . . an intentional decision to ignore the law. Thus there is no basis for excuse from any civil penalty for the violations on which a penalty is to be assessed.").

Yankee Ford's contention that the UCIA does not create a separate right of action for violations of § 1475's disclosure requirement also misses the mark. Although § 1477 of the UCIA, "Violations," does provide that any violation of the Act shall constitute a violation of the Unfair Trade Practices Act, it *also* provides:

> **3. Private remedies.** *In addition to any other remedy*, if a dealer violates this chapter, that dealer is liable to the purchaser in an amount determined by the court of not less than $100 nor more than $1,000 as liquidated damages, and for costs and reasonable attorney's fees. No action may be brought under this subsection more than 2

---

[7] The parties have cited, and the court has located, none to the contrary.

years after the date of the occurrence of the violation.

(emphasis added). The Maine Supreme Judicial Court has definitively resolved this question: "The UCIA gives an aggrieved buyer a private remedy, including liquidated damages up to $1,000 and . . . the award of attorney's fees." *Tanguay v. Seacoast Tractor Sales, Inc.*, 494 A. 2d 1364, 1365 (Me. 1985) (citing § 1477(3)). Thus, Summit has a private right of action for Yankee Ford's alleged violations of § 1475.

Because Yankee Ford violated § 1475 by failing to disclose the seven Mercury Marquis vehicles' prior use as taxis on the Buyer's Guide forms provided to Summit, Summit is entitled to liquidated damages plus reasonable attorney's fees and costs as set out in the Maine UCIA. *See* ME. REV. STAT. ANN. tit. 10, § 1477(3).[8] The court will defer a ruling on the amount of the award and the amount of attorneys' fees and costs until after trial.

### D.      Maine Unfair Trade Practices Act

Although, as explained above, Yankee Ford's violations of the Maine UCIA constitute violations of the Maine UTPA, Summit cannot recover for the UTPA violations, because "[t]hat act creates a private right of action *only* for those who have purchased goods, services, or property 'primarily for personal, family or household purposes.'" *C-B Kenworth, Inc. v. Gen. Motors Corp.*, 706 F. Supp. 952, 957 (D. Me. 1988) (emphasis in original) (quoting ME. REV. STAT. ANN. tit. 5, § 213(1)). Summit unquestionably purchased the Mercury Marquises at issue here for commercial purposes. The court, therefore, will grant Yankee Ford's summary judgment

---

[8] The Maine UCIA provides for liquidated damages in two situations: where "a dealer violates [the UCIA]" and where "a seller of a used motor vehicle who sells the vehicle to a dealer fails to disclose facts concerning that vehicle which are required to be disclosed by the provisions of section 1475." ME. REV. STAT. ANN. tit. 10, § 1477(3).  Summit has argued only that it is entitled to liquidated damages in the second situation.

as to this claim only.

**IV.     CONCLUSION**

For the foregoing reasons, the court finds that Summit's motion for summary judgment is due to be **GRANTED** and Yankee Ford's motion for summary judgment is due to be **DENIED** on all grounds EXCEPT Summit's UTPA claim. The court will enter judgment in favor of Summit as to its UCIA claim on liability but will defer a damages award; the court will enter judgment in favor of Yankee Ford as to Summit's UTPA claim. The court will enter a separate order consistent with this Memorandum Opinion.

**DONE** and **ORDERED** this 6th day of September, 2017.


_____
KARON OWEN BOWDRE
CHIEF UNITED STATES DISTRICT JUDGE